**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SARAH MARTIN, ET AL.,

      Plaintiffs,

          v.

FOSTER WHEELER ENERGY
CORPORATION,

      Defendant.

CIVIL ACTION NO. 3:06-CV-0878

(JUDGE CAPUTO)

<u>**MEMORANDUM**</u>

I am called upon to determine whether or not I should approve the settlement reached in this class action. By Order dated April 19, 2007, I preliminarily approved this Class Action Settlement. A Fairness Hearing was held on August 7, 2007.

**BACKGROUND**

From approximately 1953 to approximately 1984, Foster Wheeler operated a manufacturing plant in Mountaintop, Pennsylvania. In this manufacturing process, Foster Wheeler operated a vapor degreaser that contained trichloroethylene ("TCE"). When the plant shut down, the vapor degreaser was removed. Foster Wheeler entered into a Consent Order with the U.S. Environmental Protection Agency ("EPA") and the Pennsylvania Department of Environmental Resources ("PADER"), now the Pennsylvania Department of Environmental Protection ("PADEP"), in 1988 to investigate certain environmental concerns which included the TCE found at Foster Wheeler's former site.

In October, 2004, TCE was discovered in certain private wells to the south and southwest of the former Foster Wheeler site, and in August, 2005, Foster Wheeler entered

into an Administrative Settlement Agreement and Order by Consent with the EPA and the PADEP.  Under the terms of the agreement, Foster Wheeler agreed to undertake to provide public water access in place of private well water at each of the affected locations and arrange for the abandonment of the private wells.  The program has been completed with the exception of those residents who have chosen not to allow Foster Wheeler  to connect them to public water and/or to abandon their private wells.  Foster Wheeler continues to conduct remedial activities at the Foster Wheeler site in the area known as the Affected Area.

The Plaintiffs in this case allege that persons living in the vicinity of the site, including those who obtained potable water from private wells impacted by TCE, have been exposed to hazardous substances emanating from the Foster Wheeler  site, and further allege that they are entitled to property damages and funding for medical monitoring to provide for early detection of medical conditions, if any, caused by such exposure.  Foster Wheeler disputes that the proposed class in this litigation is entitled to property damages, medical monitoring or any other damages.

## I.      Settlement Class Certification and Approval of Class Counsel

Plaintiffs seek certification of this settlement class under  F.R.C.P. 23(b)(3).  Plaintiffs contend, and Foster Wheeler does not contest for settlement purposes, that the class certification is appropriate because (1) the class is so numerous and separate joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and, (4) the representative parties will fairly and adequately protect the interests of the class.  *Id*.

2

Further, Plaintiffs also contend that Foster Wheeler does not contest, for purposes of this settlement, that class certification is appropriate under Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  *Id.*

Foster Wheeler does not oppose Plaintiffs' request that the Court approve the law firms of Feldman Shepherd Wohlgelernter Tanner & Weinstock and Munley, Munley & Cartwright, P.C. as Class Counsel.

## II.   Summary of Settlement

_____The key elements of the settlement, as contained in the Settlement Agreement, are as follows.[1]

### A.____Settlement Class

The parties have agreed to a settlement class of a geographic boundary that encompasses the so-called Affected Area plus a buffer zone consisting of 150 feet surrounding the Affected Area and certain areas downgradient of the Affected Area, which in both cases would encompass in the Settlement Agreement, property which conceivably may be impacted for the next ten years by the TCE detected in the Affected Area.  Exhibit "A" to the Settlement Agreement sets forth a comprehensive list identifying the parcels included in the Settlement Class and provides a map depicting the geographic boundaries of the Settlement Class  (hereinafter "Settlement Class Geographic Area").  The Settlement

---

[1]  The detailed terms of the Settlement are set forth in the Settlement Agreement which is attached to Document 41.

will include all persons who owned or resided at property in the Settlement Class Geographic Area from August 1, 2004 until August 16, 2007.

### B.   Settlement Amounts to be Paid by Foster Wheeler

_____In final settlement of this litigation, and in return for full and unconditional releases of the claims of Class members who have effectively opted out, Foster Wheeler has agreed to pay $1,640,000, which funds shall be first applied as follows:

(a)  All settlement administration costs, including the costs of the Class Administrator and notice costs related to the settlement in the Martin Litigation (not to exceed $30,000);

(b)  Attorneys' fees awarded by the Court for the Martin Litigation (less any costs in (a) that exceed the limit therein stated); and

(c)   Distribution of all remaining funds to the Martin Claimants who submit the required Proof of Claim and Release Form, which shall represent consideration for settlement of the Released Claims as defined in Paragraph 19 of the Settlement Agreement, in accordance with the Allocation Methodology attached as Exhibit "B" to the Settlement Agreement.

In addition to the funds disbursed pursuant to (c) above, funds in an amount not to exceed $40,000 shall be made available to resolve certain alleged water-related problems certain members of the Settlement Class have alleged they are experiencing as a result of the abandonment of private wells located in the area where TCE has been detected ("Alleged Water-Related Funds"). The Alleged Water-Related Funds shall be distributed in accordance with Paragraph 11c of the Settlement Agreement and in accordance with the Allocation Methodology attached as Exhibit "B" to the Settlement Agreement.

### C.      Opt-Outs

Settlement Class members shall have sixty (60) days from the mailing of the notice to opt out by providing to the Class Administrator, so that it is received within the sixty (60) day period, a written request to be excluded and by otherwise complying with the requirements set forth in the Settlement Notice Plan attached to the Settlement Agreement as Exhibit "C". Settlement Class members who do not effectively opt out shall automatically be included in the settlement as Settlement Class Members and may become a Claimant by meeting the requirements set forth in the Settlement Notice Plan.

### D.      Settlement Administration

Foster Wheeler has deposited, in accordance with preliminary approval of settlement, in an interest-bearing escrow account at Associated Banc-Corp., 401 E. Kilbourn Ave., Milwaukee, Wisconsin 53202 (hereinafter the "Settlement Account") an initial payment of $100,000.  The Settlement Account shall be administered by the Class Administrator on behalf of Class Counsel.  The Class Counsel may draw from the Settlement Account to cover administrative expenses, including the costs of notice and other costs incurred in performing the duties of administration of this settlement, by submitting invoices to the Class Administrator for payment.  The Class Administrator may draw from the Settlement Account for reimbursement of fees and settlement administration costs paid by the Class Administrator and others prior to establishment of the Settlement Account.  Class Counsel will file with the Court and serve on Foster Wheeler monthly reports of activity in the Settlement Account. Should the settlement become final in accordance with Paragraph 10 of the Settlement Agreement, (upon expiration of the time for appeal if no appeal is filed, and upon an order

affirming settlement if in an appeal is filed), Foster Wheeler will deposit the remaining $1,540,000 into the Settlement Account.  It will be up to Class Counsel to petition for an award of attorneys' fees and reimbursement of costs incurred on behalf of the Settlement Class.  Foster Wheeler has agreed that it will not contest or otherwise challenge  a just and appropriate award of fees.  Those fees and costs will be paid out of the Settlement Agreement as noted above.

After the payment of the proceeds in the Settlement Account, including administration costs and attorneys' fees and costs, Foster Wheeler will not otherwise be liable for any costs, fees, expenses of any settlement class members' respective attorneys, experts, advisors, agents, and representatives.

### III.    Distribution of the Settlement Fund

Distribution of the $1,640,000 Settlement Fund is proposed to be distributed in accordance with the allocation methodology set forth in Exhibit "B" to the Settlement Agreement, which includes an explanation of the process by which the Parties developed the allocation methodology.

In summary, the allocation methodology is based on three categories of Settlement Class members.  As noted in the Settlement Agreement, "Category 1 Settlement Class Members" means all persons who between August 1, 2004 and April 16, 2007, owned and/or resided at parcels located within the Affected Area on which there is or has been a private well in use at any time since August 1, 2004; "Category 2 Settlement Class Members" means all persons who between August 1, 2004 and April 16, 2007, owned and/or resided at parcels located within the Affected Area on which there is not and has not been a private well in use

6

at any time since August 1, 2004; and, "Category 3 Settlement Class Members" means all persons who between August 1, 2004 and April 16, 2007, owned the parcels located outside the Affected Area and listed as Category 3 Settlement Class Members in Exhibit "A" to the Settlement Agreement.

A real estate appraiser, William R. Henkleman, MAI, SRA, has identified 147 parcels of property to be within the Settlement Class Geographic Area.  Even though the list of these identified parcels is intended to be all inclusive, the Settlement Class includes all parcels of property located within the Settlement Class Geographic Area depicted on the map of Exhibit "A"  to the Settlement Agreement whether or not the property is on the identified lists of parcels.  Mr. Henkleman, in an effort to arrive at a fair market value for the purpose of implementing this Settlement Agreement and the distribution of funds, used the recent assessed value of each parcel included in the Settlement Class Geographic Area.  Based on an assumption of fees and costs totaling $536,758.69 and full participation by the Settlement Class, the parties would expect the distribution of settlement funds which would be approximately as follows as a result of the utilization of this methodology for determining  a relative fair market value.

a. Category 1 Settlement Class Members shall receive approximately four (4%) percent of their assessed property value as indicated on Attachment 1 of Exhibit "B", which is expected to be approximately on average $4,800 per designated parcel.   Additionally, Category 1 Settlement Class Members shall also receive $20,200 per designated parcel for damages other than diminution in property value, including, but not limited to, future costs of medical monitoring and water damage to property.

b. Category 2 Settlement Class Members shall receive approximately four (4%) percent of their assessed property value as indicated on Attachment 1 of Exhibit "B", which is expected to be approximately on average $4,800 per designated parcel.

7

      c.      Category 3 Settlement Class Members shall receive approximately two (2%) percent of their assessed property value as indicated on Attachment 1 to Exhibit "B", which is expected to be approximately on average $3,000 per designated parcel.

In addition, in the case of Category 1 Settlement Class Members, if during the period from August 1, 2004 to April 16, 2007, someone other than the owner resided at the property, the resident, not the owner, shall receive the $20,200 portion of the award for other damages.

The Settlement Agreement instructs the Class Administrator to apply the foregoing formula in a reasonable manner and adjust the awards proportionally in the event that the costs and fees paid out of the Settlement Fund are more or less than expected and/or if participation of Settlement Class Members is more or less than expected. The Class Administrator is given authority by the Settlement Agreement to make such other determinations or adjustments regarding distribution of the settlement funds as necessary to carry out the purposes and intent of the Settlement Agreement. The parties do not intend to permit claimants to challenge the assessed values of their properties, but the parties have established a mechanism under the terms of the Settlement Agreement and Allocation Methodology, attached as Exhibit "B " to the Settlement Agreement, by which claimants may appeal their allocated share of the settlement funds and the Class Administrator may adjust such share in appropriate cases.

The Allocation Methodology calls for the calculation of a single benefit per designated parcel. Where the parcel has been owned or resided in by multiple persons, the total benefit for a parcel is to be divided between current owners/residents and former owners/residents of the parcel. Current owners/residents will receive fifty percent (50%) of the parcel's total benefit and the remaining fifty percent (50%) will be divided among all who owned/resided at

the parcel from August 1, 2004 to April 16, 2007, based on the number of years and/or months of ownership/residency.  The current owner/resident period of ownership/residency is included in making the preceding allocation, so that, for example, if the claimant has owned/resided for one-half the total time period, then the current owner/resident would get seventy-five percent (75%) of the parcels' share (50% plus 25%).  As an alternative, the Class Administrator has the right and power, under the Settlement Agreement, to fairly distribute the parcel's award among multiple Claimants for the benefit awarded to that parcel.

Benefits allocated to any parcel in the Class Area which have no claims filed for them will be considered Unclaimed Benefits.  For parcels that do have claims filed for them, but where the entire period of time back to August 1, 2004 is not covered by a claim, the benefits that would have been paid out to the unclaimed time period are also considered Unclaimed Benefits.  These benefits will not be awarded to other owners of that given property who did file a claim.

When all claims have been received and validated, the Class Administrator will be able to determine the total amount of Unclaimed Benefits, if any.  The Class Administrator is directed by the Settlement Agreement to distribute to any and all Claimants a roughly proportionate share of the total Unclaimed Benefits relative to the distribution realized from the application of the formula for the payment of claims.

### IV.    Foster Wheeler's Right to Withdraw

Foster Wheeler may withdraw from the settlement if Foster Wheeler reasonably determines that opt-outs from the settlement would expose it to significant or material, additional liability for claims sought to be settled by the Settlement Agreement.

## V.     Discussion

The fundamental issue is whether the settlement or compromise in a class action suit is "fair, reasonable and adequate". *Lazy Oil Co. v. Witco Corp*., 95 F.Supp.2d 290, 329 (W.D. Pa. 1997, *aff'd* 166 F.3d 581 (3d Cir. 1999); Rule 23(e)(1)(c) Federal Rules of Civil Procedure. *Gersh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), lists nine (9) factors for consideration as to whether a class action settlement is fair, reasonable and adequate.  They are: 1)  the complexity, expense and likely duration of litigation; 2)  the reaction of the class to the settlement; 3)  the stage of the proceedings and the amount of discovery completed; 4)  the risk of establishing liability; 5)  the risk of establishing damages; 6)  the risk of maintaining the class action through the trial; 7)  the ability of the defendants to withstand the greater judgment; 8)  the range of reasonableness of the settlement fund in light of the best possible recovery; and, 9)  the range of reasonableness of a settlement fund in light of all the attendant risks of litigation.  I will consider the factors.

**1.  The complexity, expense and likely duration of litigation**.  Given the insidious nature of the pollution from TCE, it is obvious that the litigation is both complex and expensive.  Moreover, it is likely to last.  There have been years of oversight by the EPA and there is little question but there are complicated factual and scientific questions which concern the source of the TCE, its travel and its specific impact on the particular members of the Class.  There are also complicated legal issues regarding medical monitoring which is an unsettled area of the law.  There are those who believe that there is no residual effect of TCE, and apparently there are those that do.  This bodes for a complex and expensive resolution.

**2.  The reaction of the Class to the settlement**.  The vast majority of the Class finds the settlement favorable.  There are approximately 147 parcels which fall into the Affected Area.  Approximately 20 parcels have indicated they wish to be excluded.  These exclusions are based on the fact that the people involved have either begun their own litigation or have expressed a view that they have no problem with the Foster Wheeler Corporation.  Therefore, over 85% of the settlement class have either chosen to participate by opting in or have expressed no issues with the settlement.  Of the 85%, there are four (4) objectors who object to the property valuation and seek more for the diminished value of their property.  The other objectors are essentially opposed to the settlement for a variety of reasons which will be considered later in this Memorandum.

**3.  The stage of the proceedings and the amount of discovery completed**.  From what the Court can determine, there has been very little discovery, however, there has been an extensive amount of investigation performed by counsel for the Class as to levels of contamination and diminution in value of the various parcels within the Affected Area.  By the same token, it is true that EPA and the PADEP have investigated the situation for years and those findings were made available to Class counsel.  Nevertheless, as indicated previously, this is a complicated case and would involve the discovery of attempting to determine the source of the TCE, its flow through fractured rock and its consequent impact, if any, on the homeowners.  There were other plants where TCE was a product in the same general vicinity and EPA cannot say that the source of the TCE in the Affected Area is Foster Wheeler. These problems do not bode well for simple discovery, but rather suggest a rather complicated pursuit of ascertaining the source of the TCE and its impact on the Affected Area.

**4. The risk of establishing liability**.  Again, the source of the TCE and its path through fractured rock is a difficult matter to litigate.  There would have to be extensive factual discovery and extensive scientific evidence.  Moreover, the Plaintiffs would have to prove not only the source of the TCE but also the actual diminution in the value of their property.  Plaintiffs would also have to prove that the exposure to the TCE was consequential in the face of the EPA's conclusion that there was no threat to public health from the TCE.  Moreover, Foster Wheeler agreed in the consent Order to put people in the Affected Area on public water and the question would also be whether or not this was not sufficient in terms of a remedy.  Lastly, the medical monitoring question is unclear in terms of the state of the law and the quantum of proof.  Thus far the standard in Pennsylvania is as follows for prevailing on a claim for medical monitoring:

1) Exposure greater than normal background levels to a proven hazardous substance; 2) Caused by the defendant's negligence; 3) As approximate result of exposure, plaintiff has significantly increased the risk of contracting a serious latent disease; 4)  A monitoring procedure existed makes the early detection of the disease possible; 5)  The prescribed medical monitoring regime is different from that normally recommended in this absence of the exposure; and, 6) Prescribed monitoring regime is reasonably necessary according to contemporary scientific principles. *Redland Soccer Club v. Dept. of Army*, 696 A.3d 137, 145, 246 (Pa. 1997).   There appears to be no evidence of exposure greater than normal background levels.  Indeed, EPA has indicated that there is no health hazard.  There is no question TCE is a hazardous substance.  Causation is addressed and is a problem.  Whether or not any latent disease can occur as a result of exposure to TCE is unknown by the Court since there has been no evidence presented either way.  Nor has there been any evidence

of a monitoring procedure which makes early detection of disease possible.  Likewise, the prescribed medical monitoring regime which is different from that normally recommended in the absence of the exposure has no evidence to support or defeat it.  Lastly, the Court has no evidence concerning a regime which is reasonably necessary according to contemporary scientific principles.

Frankly, the Court is uneasy with respect to the medical monitoring aspect of this claim.  The Court, however, is aware that the EPA has indicated that the levels of exposure are no threat to health, and this, coupled with the fact that identifying Foster Wheeler as the source of the TCE, makes this particular claim a difficult one in the context of the circumstances of this case.

The only indications that I have are the representations of counsel which indicate TCE can cause injuries, but no injuries are latent.  In addition, Plaintiffs' counsel represents that the value of medical monitoring is not substantial.  It might be a good idea for each individual to have a physical, but no expert would say to do it every year in this case.  Again, these are the representations of counsel, and while I have no doubt counsel is making them in good faith, there is little evidence for the Court to put its arms around with respect to this particular issue.

Notwithstanding the foregoing, in view of the difficulty in proof of responsibility on the part of Foster Wheeler, and the lack of evidence of TCE being responsible for latent disease, the court is satisfied with this aspect of the settlement.

**5. The risk of establishing damages**.   Essentially, this is a property damage case, the most significant item of which is the diminution in value of the property which is the Affected Area.  The source of the TCE and its consequent infliction of harm has, in large part, been addressed.  The difficulties with respect to establishing Foster Wheeler as the source have been addressed and remain a problem.  Assuming *arguendo* that Foster Wheeler is responsible, the question of establishing damages is one of some concern.  If TCE levels are not at an unhealthy level, there is certainly a strong argument that there has been no diminution in the value of real estate.  Assuming that there is a diminution in value simply because of the notoriety of a hazardous chemical being extent in the neighborhood, calculating the diminution in value of real estate is again a difficult exercise at best.  The methodology which was used to calculate the diminution in value, while not perfect, does represent a methodology that is uniform and does, in large part, compensate for what is an unclear item of loss.  A more important question is establishing the damages in the first place because of the difficulty in establishing Foster Wheeler as the source and further establishing that the levels of TCE are at a level which are harmful in the face of an EPA finding to the contrary.  Therefore, it is my view that the medical monitoring matter has been discussed and it too falls into the category on which is difficult to establish.

Assuming that there is a claim for "vapor intrusion damages", it is difficult to establish any damages as a result of such a phenomenon.   The government agencies which investigated the contamination in Mountaintop, mainly the EPA and the Agency for Toxic

14

Substances and Disease Registry ("ATSDR") have tested the indoor air at the residence with the highest reported TCE concentrations and concluded:

> Exposure to reported levels of TCE and indoor air at this site is not expected to cause adverse health effects in children or adults, we have categorized potential exposures to TCE from indoor air in a single residence described in this document as a "no apparent public health threat.

*See,* Exhibit "D" to Response To Statement Of Objections To Class Settlement (Doc. 60).

Insofar as "water flow damages", a water related damages fund has been established whereby settlement Class Members can apply for reimbursement of costs for solving these problems.  Again, causation is a problem for the Plaintiffs.  Nevertheless, given the difficulty in proving responsibility, this fund seems sensible as a settlement item in the resolution of this matter.

**6.  The risk of maintaining the class action through the trial**.  The Court sees no reason why this factor could not be met.

**7.  The ability of the defendants to withstand the greater judgment**.  There is no doubt Foster Wheeler could withstand a greater judgment.

**8.  The range of reasonableness of the settlement fund in light of the best possible recovery**.  "There is a 'range of reasonableness with respect to a settlement' that recognizes the uncertainties of law and fact in the particular case and the risks and costs inherit in litigating to the end".  *Lazy Oil*, 95 F.Supp.2d at 339.  In evaluating the settlement, "the court must determine whether the recovery falls within that range of reasonableness, 'not whether it is the most favorable, possible result of the litigation'".  *Id*. at 338.  I have discussed the difficulties confronting the Plaintiffs in proving a case against Foster Wheeler Corporation ("FWC").  First and foremost, is proving that FWC is the source of the TCE.

15

There were others in the area who produced TCE and that alone poses a problem as to whether the TCE that impacted on the wells in this case came from FWC.  There would be difficulty proving by a preponderance of the evidence that FWC was the source of the TCE. The second problem of proof is proving that there is a health hazard and therefore damages emanating therefrom.  Government authorities, viz the EPA and the PADEP have indicated that the TCE which exists in the Affected Area is not to a level which poses the health hazard.  One area that does cause the Court some discomfort is whether or not there is a latent aspect to TCE.  There was discussion and argument in the briefs which suggest that TCE does not have latent properties.  However, at argument there were suggestions from objectors' counsel that there was evidence to that effect in the scientific community.  In this connection, I have already discussed medical monitoring and have applied the tests that exist for determining whether such a remedy is appropriate and I have concluded that even if the monitoring were possible, the problem reverts to the assessment of responsibility to FWC.

Also comprising part of this evaluation is the effort to arrive at an appropriate methodology for assessing property damage.  Again, while the methodology which has been used to determine the diminution in value of the real estate is not perfect, given the difficulty that the Plaintiffs have in assessing legal responsibility for the TCE in the affected area to FWC, the methodology is, in my view, appropriate.

Part of the settlement also requires a Deed Noticing Acknowledgment, Easement, and Restriction to be incorporated into the Deeds of the members of the Class.  The language used is contained in Exhibit "E" attached to the Response to Statement of Objections to Class Settlement (Doc. 60).   These acknowledgments, notices and restrictions were

16

developed by the PADEP in connection with Pennsylvania's voluntary remediation program. The Government agencies have not directed Foster Wheeler or any other entity to perform further remedial activities in the Affected Area.  The easement component is necessary. Furthermore, the Deed Noticing Acknowledgment, Easement and Restriction does not expand the already existing duty on the part of those residents with contaminated ground water to notify subsequent purchasers of the contamination.  *See Quahsnock v. Frost*, 445 A.2d 121, 125 (Pa. Super. Ct. 1982).

Lastly, there is a release which is required by the Settlement Agreement from the Plaintiffs to FWC.  The Settlement Agreement states in Paragraph 19(a) as follows:

> . . . with respect to claims for personal injury or wrongful death, Released Claims shall not include claims solely arising from or attributable to exposure to contamination or hazardous substances for which Foster Wheeler is allegedly responsible that occurs after the date of this Settlement Agreement or claims that could not have been brought prior to or at the date of this Settlement Agreement.

Some who object do so on the basis that this clause bars future claims.  To the contrary, it is the Court's view that any claims for any harm caused by TCE which has not yet occurred may be brought at a later date.  The discomfort the Court has is with the word "solely". Arguably, this modifies the law of causation from substantial factor to sole and exclusive cause, which is a higher standard for causation than general negligence law requires.  *See Wagner v. Anzon, Inc.*, 684 A.2d 619 (Pa. Super. 1996), (where the court held that "the defendant could be found liable even if the defendant's conduct was not the sole cause of the plaintiff's injuries.")  *Id.* at 633, and *Gustison v. Ted Smith Floor Prod., Inc.*, 679 A.2d 1304 (Pa. Super. 1996) (where the court noted that the standard jury instruction states that "The plaintiff is entitled to recover damages for all injuries which the defendant's negligence

17

was a substantial factor in producing.  The defendant's negligence need not be the sole cause of the injuries; other causes may have contributed to producing the final result.")  *Id.* at 1310 (quoting Pa. SSJI (Civ.) 6.30).

Therefore, the use of the word "solely" in the release arguably creates a higher standard than normally required in determining causation.[2]  The task for an individual seeking to assert a claim for an injury as a result of exposure to TCE for which Foster Wheeler is responsible would be daunting whether measured by the causation standard under Pennsylvania law or the higher standard arguably called for by the Settlement Agreement.  First, against a backdrop of the EPA finding that contamination is not a health hazard, the prospect of a future health hazard from TCE while not known, with present information, appears minimal.  Second, and in any event, the same task of proving that it is Foster Wheeler's TCE would remain.  A standard stricter than settled Pennsylvania negligence law,  when measured against the difficulty of proving both of the forgoing conditions, does not cast enough weight for the court to reject the settlement.

## VI.    Objections to the Class Settlement

A number of objections have been leveled by Members of the Class.  I will now deal with those objections.

### 1.    Many are unhappy with the settlement, including the Class Representative.

This has been discussed, and it is true that there are some are unhappy with the Settlement, however, it is a minority as noted previously.  Moreover, the fact that the Class

---

[2]  The Court is not making a determination of the meaning of the release provision in this regard, but merely noting it as a predicate to the determination that the responsibility of Foster Wheeler would be difficult to establish in either event.

Representative is unhappy is not a bar to the settlement.  *See Lazy Oil*,  95 F.Supp.2d at

333, (approving settlement where three out of the four class representatives objected).  *See*

*also, Austin v. Pa. Dep't of Corr.*, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) (holding that "the

mere fact that there is opposition, even from class representatives, does not necessitate

rejection of the settlement."); *Byran v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir.

1974)(upholding district court's approval of settlement where more than 20% of the class

objected).

> **2.     Given the strength of the case , payments are far too low.**

The Court  disagrees that the case is strong on the side of the Plaintiffs.  I have noted

many times during the course of this Memorandum that assessing responsibility to FWC by

a preponderance of the evidence was a difficult task.

> **3.     The release of liability is too broad and may bar serious bodily injury claims in the future**.

I have noted that the Court has some discomfort with the use of the word "solely" in

the release language.

> **4.     The deed noticing acknowledgment, easement and restriction is overreaching and contributes to further diminution in property value.**

The argument also is that easement allows for continued pollution in perpetuity.  I

have noted that this easement language is required by law as well as the practical need to

have the ability to enter premises in the affected area should there be further TCE entry.

This is because there has been no further remedial activity ordered by federal or state

agencies involved in the matter of the control of hazardous substances.   Without an

easement, any further remedial measures necessitated by recurrence of any sort of such a

problem would be difficult to say the least.

**5.      The methodology for diminution of property value is flawed.**

They contend 4% of the assessed value as the diminution damages not fair.  I have

discussed this and I have concluded that given the difficulty in proof for establishing the

responsibility of FWC by a preponderance of the evidence, this methodology is appropriate

for assessing damages in settlement.

**6.      The compensation for medical monitoring is too low and the class does not include numerous people who drank and used the contaminated water.**

Essentially what the objection says is that $20,200 per Category 1 parcel is not

adequate.  It seems to me that this is speculative.  There has been no evidence offered that

indicates the necessity of medical monitoring in the first place.  Moreover, the difficulty in

holding FWC responsible adds to the weakening of this objection.

**7.      The settlement does not account for vapor intrusion damages**.

The Defendant has not fully evaluated the impact of TCE vapor intrusion into homes

by way of polluted ground water flowing beneath the homes.  I have discussed this in a

previous part of this Memorandum.  There was a test performed inside of a home where

TCE was detected.  The testing agency determined that there was no level of TCE that rose

to a level of a health hazard.

**8.      Lack of adequate evaluation and compensation for water flow damage.**

There is $40,000 reserved and the objection is that this amount is inadequate.  Thus

far, only two people have filed for this benefit, and in each case it was less than the allotted

amount.  Again, considering the likelihood of success in this case, the Court is not of the

view that this objection is meritorious.

**9.     The class settlement notice did not fully explain the consequences of opting out.**

"The notice document must describe, in detail, the nature of the proposed settlement, the circumstances justifying it, and the consequences of accepting and opting out of it." *In re Diet Drugs*, 226 F.R.D. 498, 518 (E.D. Pa. 2005).  These requirements have been met. the notice states "If you effectively opt out, you will not be eligible to participate in this distribution of any settlement funds, you will not be bound by the Settlement Agreement and you cannot object to the settlement."  In my view, this describes the consequences of opting out of the class.

## VII.    Settlement

In conclusion, and for the foregoing reasons, it is my view that the Settlement proposed is fair, reasonable and adequate, and will be approved.

Date: December 14, 2007                    /s/ A. Richard Caputo
                                                    A. Richard Caputo
                                                    United States District Judge

21

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SARAH MARTIN, ET AL.,

    Plaintiffs,

       v.

FOSTER WHEELER ENERGY
CORPORATION,

    Defendant.

CIVIL ACTION NO. 3:06-CV-0878

(JUDGE CAPUTO)

## ORDER

**NOW**, this 14th day of December, 2007, **IT IS HEREBY ORDERED** that the Settlement is approved, and the terms of the Settlement Agreement shall be executed in accordance with this Memorandum and Order and the Order Granting Preliminary Approval of Class Action Settlement dated April 19, 2007.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge